All right, now I was a step ahead of myself. Case number seven, Patel against Barr, 19-3338, is submitted on the briefs and so we will move to case number eight for this morning, Barbara Jones against Commissioner Andrew Saul, Commissioner of Social Security, and we will hear first from Mr. Richter. Thank you, Your Honor, and may it please the court. In this case, the ALJ relied on her own impermissible unilateral medical judgments to conclude that plaintiff appellant could safely perform the residual functional capacity relevant adjudicatory period, which her own agency's reviewing physicians appeared to conclude resulted in severe re-injury just a few months after the date last insured is salient here. The Social Security Administration does not view the date last insured as a statute of limitations. That a person attempts to work after a date last insured does not preclude them from obtaining disability benefits prior to date. Here the court has before it a unique circumstance where a claimant after the date last insured attempted to work at the could during the relevant adjudicatory period and in doing so the claimant totally ruptured her rotator cuff, which she had had an operation on just months prior to the date last insured. Could I ask you a practical question, Mr. Richter? As I understand your argument, the vocational expert is first asked a question about the residual functional capacity that you're objecting to, which I certainly understand that, the 50 pounds occasionally, 25 pounds frequently, etc. And past relevant work is okay under that RFC. And then the ALJ, as I recall, does say what if it's just 20 pounds occasionally, 10 frequently, and the vocational expert says can't do the past relevant work. But then, as I understand your point, there's a gap in the record. This vocational expert doesn't in any kind of formal sense, or at least the ALJ doesn't move on to step five. I mean ordinarily if you if you don't see step four satisfied, you move on to step five and ask about the national economy. So I take it it's your position just as a matter of administrative regularity you've got to get that ruling out of the ALJ prevented herself from having to go to step five by adopting that medium residual functional capacity. I mean so it's possible if there were a remand, I don't know, I'm not a mind reader, but it's possible that moving on to step five, if the RFC really is lift and carry 20 pounds occasionally, 10 frequently, there might be jobs in the national economy and there'd still be a finding of no disability. It is possible, your honor. However, the the state agency RFC also included limitations on reaching forward and and above the head, which is highly relevant to the the jobs in the Dictionary of Occupational Titles. And in fact, when presented with the the state agency physicians residual functional capacity, the vocational expert came up with 54,000 jobs. Two jobs that exist in the number of 54,000. And this is this furniture rental clerk and usher? That's that's correct, your honor. And had the ALJ gone with that state agency residual functional capacity, it would have been her burden to demonstrate, one, that the that those numbers are supported by substantial evidence. And two, she would have had to make a finding that 54,000 jobs, which represents 131 percent of all the jobs in the national economy, are significant. And well, that's at her felt about that was that she didn't go with that light residual functional capacity with additional reaching limitations, because she would have had to have concluded that 54,000 jobs was a significant number in the national economy. And as I said, one third of one percent is actually a pretty minuscule number when you think about it. No evidence about the regional economy, I mean, sometimes they talk about, and in this area, there would be X number of these jobs. They do sometimes, your honor, and that would have been one of the one of the avenues she were questions she would have asked most likely or needed to get the answer to if she were to conclude at step five that a person with that state agency residual functional capacity could could perform a significant number of jobs. So, as we've discussed, no doctor here supports the residual functional capacity the judge ultimately adopted. In fact, the agency's own reviewing physicians concluded that a penalty injury, well, they implied that was an indication she could not perform the residual functional capacity that the ALJ ultimately assigned to her. Can I ask you this? Is there any problem in this record with the fact that we're assuming that these doctors' opinions can be extrapolated backwards in time a bit because they come after the date last insured. Now, that happened. I've seen plenty of cases where you can say this is what you're like on this day, but that condition takes a while to reach that point, so it's rational to say that a year ago you actually already had it. But that's not really spelled out in this record. I agree, your honor. So here you've got a you've got a person who has a rotator cuff issue before a date last insured and has an operation on it. And then for a few months goes back to work at the residual functional capacity that the ALJ ultimately concludes she could perform during the relevant period. And what happens is she totally ruptures that rotator cuff. And the state agency physicians, they're looking at the entire thing. So they know she went back to work, they know the exertional requirements of the job, and they're looking at it and concluding, well, the maximal safe functional capacity for this person to perform is light work with only occasional overhead and forward reaching. And the ALJ in her decision second-guesses that and doesn't necessarily give a great explanation for making that kind of medical judgment. And it is a medical judgment. And critically for you, it doesn't say, and then there's Dr. Smith who has said the other capacity is acceptable. I'm sorry, your honor. Could you repeat that? I had some feedback. The thing that's different about this case from many is that the ALJ doesn't say, I'm just, I'm not crediting opinions number one, two, and three, but I like opinion number four. There is no opinion number four here. Right, and that's what we like in the Aiken-Gowen type of case, but the judge should have solicited that fourth opinion if she were going to overturn her doctor's judgments on the medical records. That's something that she needed in order to conclude against those medical judgments. Because, you know, it's just looking at this, deciding what a maximal functional capacity is for a person who has a pre-existing shoulder impairment, and then they go back to work for a couple months, they're doing the residual functional capacity that the ALJ ultimately concludes they can, and then they rupture that rotator cuff. And so, was that actually their maximal residual functional capacity? I'm not sure there's any better evidence that it wasn't than the fact that the shoulder ruptured when she attempted to to do that level of work. Okay, well if you'd like to save a little for rebuttal. I would, Your Honor, that'd be good, thank you. Why don't we do that then. All right, Mr. Schaefer. Good morning, and may it please the court. My name is Ryan Schaefer, and I represent the Commissioner of Social Security, Andrew Saul. As we've just heard, this case is about a very limited period. About a year between June 2013 and the end of June 2014, and this is because Ms. Jones was last insured for disability insurance benefits on June 30th, 2014. As a result, Ms. Jones had to prove that she became disabled prior to June 30th, 2014. Now, the problem for Ms. Jones is that much of the medical opinions occurred after June 30th, 2014. Ms. Jones does not show that this later evidence really addresses a period prior to June 30th, 2014. Why doesn't she show that in part, though, through the very nature of the earlier injuries, which are before the date last insured, and the opinions that are, in a sense, follow-up opinions? So that's my first question. My second is, I'm very disturbed at the idea that an administrative law judge can say, I don't like any of the medical opinions in the record, and I'm going to make up a medical opinion of my own. Sure, so addressing those two points, when it comes to Ms. Jones's right shoulder, she had the surgery in early June, 2013. This was her first rotator cuff surgery. She had some follow-up treatment all the way to November, 2013, with Dr. Bales, who was her treating orthopedist. In November, 2013, she had minimal complaints, was doing really well, and the examination findings were normal with respect to rotator cuff strength and anymore, unless she needed to come back. And after that point, there was no treatment, no complaints, and no abnormal medical findings about her right shoulder through June, 2014, and for several months after, until she re-injured her right shoulder. Now, a pivotal finding in this case, the ALJ repeatedly said that Ms. Jones lifted at least 35 to 40 pounds at her job in July, 2014, which is after the date last insured, for several months. So she was repeatedly lifting this amount. Page 57 of the administrative record is her testimony on this point. She was repeatedly lifting this amount without having any injury. Now, your Honor's question about the ALJ's residual functional capacity not being based on a medical opinion, I cited to many cases Diaz v. Chater, Schmidt v. Astrew, I think Thomas v. Astrew, in which the Seventh Circuit found that an ALJ's residual functional capacity did not need to be based on a medical opinion. Sure, it needs to be supported by substantial evidence, and I want to be clear about that, but it doesn't have to be. But what do you do about the fact, I mean, she says, I mean, the government relies very heavily on this comment of hers that she could lift 35 to 40 pounds prior to when she re-injures the shoulder. But we have a number of cases that say people sometimes engage in more than they should. I mean, they're straining themselves because they need the work, basically, they're not doing it just for fun. They need the work, they need the pay, and yet they are imposing more on themselves than they should have to. Sure, so there are a couple of questions about the circumstances of her injury. As the district court noted, Ms. Jones had this injury, the head or cuff, while lifting a large refrigeration unit. We really don't know what that weighed, it's just in the record it says it was a large refrigeration unit, and that was page 660 of the administrative record. Right, and so the question is, in part, is that something that goes along with the RFC that the ALJ adopted? I can't remember from that piece of evidence whether she claims she's lifting this large refrigerator unit all by herself or whether she's just one of, say, two people who are lifting it or three people who are lifting it. Sometimes for heavy things, you would have a couple of people doing it. So it might be well within the RFC. I believe her statements were that she did lift it with another person. Right, that's what I mean. So divide the probably did not exceed the RFC. Well, again, it's not part of the record. I do know that some refrigeration units are in the hundreds of pounds, but we don't know. Fair point. Ultimately, though, and this is an area that there's been some confusion, the ALJ found that Ms. Jones could return to her past relevant work, which included light work. So light work, as you know, is 20 pounds occasionally, 10 pounds frequently. And light work is consistent with the past relevant work of gate guard and short order clerk. But here's the problem with that. The vocational experts said that as she performed her past relevant work, it was at the higher exertional level. And when asked, you know, what about the lower said you couldn't do your past relevant work. So I really think that pushes you into step five. I don't know that you can cling to step four there. Well, the hypothetical was actually more than just a limitation to light work. It involved pushing, pulling overhead. I hate to read the whole thing every time. I know. So on that, with that distinction in mind, it's true. And actually, that hypothetical comes into play as we consider the ALJ's weighing of the state agency opinions from Drs. Montoya and Whitley. And based on this question to the vocational expert, the vocational expert identified that such an individual, an individual with Dr. Montoya's and Whitley's limitations, such an individual could still perform other work, including usher and furniture rental clerk. And this other work comprised more than 50,000 jobs in the national economy. And so regardless of whether, as I've said before, the ALJ's findings for the state agency opinions were supported by substantial evidence. But even if we had questions about them, the ALJ, the ALJ's elicited testimony from the vocational expert that would lead to affirmance of the ALJ's decision, because you have these other jobs, usher and furniture rental clerk, which Ms. Jones could still perform. Now, one key finding in this case, we talked already about Ms. Jones's testimony about lifting at least 35 to 40 pounds for several months. And you're equating 40 pounds with 50 pounds? Well, it's similar. It's not the same. It's not the same. I haul large bags of cat litter around, and it's really quite different to pick up a 50-pound bag from a 40-pound bag. Yes. And I know that Ms. Jones has made different statements throughout the record about precisely what the upper cap was. I do know that in portions of the record, as I cited in my brief, that she said she lifted up to 50 pounds. I'm just going with her testimony, because that ultimately is what the ALJ relied on the most in this case. And I'm saying to get to the 50-pound level, you need evidence that it goes all the way up to 50. I'm being a little flip, but, you know, 40 is not the same as 50. Well, Ms. Jones's testimony was that she lifted at least 40 pounds. And that coupled with the fact that, as I noted, even a limitation to lifting 20 pounds by itself would not preclude her being able to perform her past relevant work, whether it's light or medium. It doesn't make much difference on that issue. Okay. So looking at the overall evidence here, the ALJ repeatedly noted that there were either minimal or no complaints during the relevant period between June 2013 and June 2014. The ALJ noted many normal examination findings, and the ALJ also discussed a lack of treatment. And those findings really underpin the ALJ's findings for the residual functional capacity and the weighing of the medical opinions. At this point, if there are no further questions, I ask that the court affirm the commissioner's decision, the ALJ's decision. All right. Thank you. Anything further, Mr. Richter? Yeah, I just want to quickly, Your Honor, on those two other jobs had the ALJ adopted that residual functional capacity. You know, part of the harm here is that if she had adopted the doctor's residual functional capacity instead of making her own medical judgments, she would have had to proceed to step five, where it would have been her burden to demonstrate that the jobs the vocational expert testified to were supported by substantial evidence, which there was, you know, contentious cross-examination and a question of that in the hearing transcript. And two, she would have had to make a finding that one-third of one percent of the jobs in the national economy are significant. And because she ended it at step four, we didn't get those findings. All right. Well, thank you to both of you. We will take the case under advisement.